May it please the court, I want to start with the issue specifically on the statement that we addressed in our brief that should have been excluded from the trial where Mr. Mcmaryon had been in the custody of the probation office and made an incriminating statement which was heavily stressed during the jury trial as well as in closing argument by the United States. Really kind of going down into what is this exact issue, I believe that it's a little bit novel being the specific facts of the case and that this court has not ruled specifically on the issue. Has any circuit ruled on just on a scenario where probation officers are notifying someone who's on supervised release that they're going to go into the home and then that person says oh here's what you're going to find. I could not find a single case where that exact pattern came in but I did find cases where the suspect was in the custody of an officer of some sort which a probation office is still considered officers and there's two circuits, second and the third circuit that have decided the issue basically when you've informed a suspect that they're a suspect in a potential crime and they know of it even if they don't ask specific questioning that it falls under Innocence Functional Equivalent. But would you agree that a police officer with a suspect, that police officer is looking for evidence of the crime whereas probation officers when they say we're going to go check your house out, they're trying to help the person rehabilitate. There's no, you can disagree, but there's no contrivance. They're not trying to get the person to incriminate himself in a crime. Isn't that pretty fundamentally different? I would agree in that sense but the case law says we don't look to the officer's intent. We looked at the objective reasonableness of a suspect. We look only at how they would have perceived the situation and in this case he had the handcuffs, they had put a belly chain, they had taken him into the custody and the office took him back to a back room that looked like an interrogation room. The district court didn't confirm that there was custody here and that's maybe where we should have started because that's a procedural problem. The district court asked you why you didn't file a motion to suppress and do you want to explain why or is that outside the record? I don't know why. I wasn't hired until after but I do agree that it would have been procedurally better to do a motion to suppress but it's still preserved for purposes of review by this court. Normally when these issues come up it's because someone filed a motion in limine and did not object when the evidence was coming in before it got in. Here they did do a motion in limine, the court did grant conditionally on that and then when it was about to come in they did a bench. Well the court didn't really grant the motion to exclude, the government pre-termited it by saying don't worry we won't use his statement. They said they would not go into it. And then you're not appealing the government trial statement that McMarion opened the door to it when he said he didn't speak. That's not before us. It is. I don't think that that's briefed well enough that I don't think that's really the main issue. Okay, so then the Fifth Amendment issue was presented and you're not disputing that they came up with a subterfuge to be able to offer it and then the District Court voir dires Richards correct? I don't, I mean our brief goes into that and I don't think that we, we're not waiving the fact that it was properly admitted under that theory. What we're saying is that the court erred when it found that it wasn't questioning because it can be either questioning or the functional equivalent of questioning to meet the second prong. The custody, I don't believe that we can say that the court did not make that ruling because when you look at the statement that the court made, you know the court did say you know that you know we're not even looking at the custody. Let's get to whether it was interrogation or not. Exactly, okay, perfect. Oh well, I think that is a fair, fair reading of the record here. Okay. Um, but what, I guess again what's your best case that, I mean the functional equivalent in this test is a little bit, it's just highly fact dependent so what's, what do you think is the closest case that says no, District Court you're wrong, this was eliciting an incriminating answer? Well, I, actually they're out of the second and third circuits, um, Nelson versus Fulcomer which was in the 28J letter and then, um, Symaniac, um, that's out of the second circuit and those go into when, um, when the, when the suspect is in custody and is implicated in a crime. So your best, you know, I just have to stop you, your best authority is 28J authority that you gave us this morning? What's your best authority from the brief? Because my guess is the government hasn't had any chance to look at these. I'm not sure, I apologize for the late, um, the, the fifth circuit does not have any authority nor does the U.S. Supreme Court. Reading, reading the NS opinion I think is a good place to start and how do we apply NS, but it's, it is basically a first, first impression type of situation where we don't, we do not have a case binding here on this issue and, and when you're looking at the circumstances of an objectively reasonable suspect and not. Would your rule of law, if we're not just writing it for these facts, would your rule of law be whenever probation as a courtesy to someone they're supervising says to them, and we intend to go check your house today, they always have to read Miranda rights? No. I don't. What's the rule of law? Um, I think what it needs to be in is that, um, that when the, if the suspect would be by any officer, uh, probation or otherwise, looking at the totality of circumstances that they would believe they were a suspect in the crime and that the, the, the statement was elicited by the fact that they were self-incriminating based on the statement. So here, it wasn't just that the, the parole brought him in and said, okay, we, we were trying to get you back on track. Um, the woman who had come to the house to do the inspection found three casings or three I think the, the officer that actually brought him in testified that he had been, I think he overheard her speaking about it and he's the one who sort of initiated the search. So he brought him in. But it was weeks later. Yeah, it was weeks later. They brought him in on a non, a non-scheduled probation day. So they brought him in, they put him in handcuffs, a belly chain, brought him back to the room to interrogate him. And what the officer said to him was, we're aware that you violated, we are aware that you have committed another offense because you have these, these bullets at your house that, that's a 922-G1 offense. So he was then in a situation where he was being accused of a crime weeks, mere weeks after being released from the same crime. And he was, he. Remind me, I'm sorry to interrupt, but you're saying the testimony from Richards was he actually said to this man, that's a 922-G new offense? No, but I. Was there any reference to a new offense or was it just, we're going into your house and then your client blurts out, well, could you give me a second chance again, as I was given before? He, I think the, what he had given him the condition of the probation that he was subject to search. Yeah. He said, we're going to do a search. One of the PO's saw ammunition in your house. And he, and he said, that's when our client blurted out. But he had just been released on the exact same charge. So a reasonable, objectively reasonable suspect that had been convicted and served time for 922-G1 would know in that moment that he would just, he was being accused of another crime because he had already been left out. There were bullets. That is a 922-G1. What exactly did he say? I mean, I guess Richards' testimony is all over the place, but what exactly is it that your client said when they said, we're going into your house? He said, um, they had said, we're going to go get, you're supposed to get rid of the ammo. We're going to go check to make sure you did. And he blurted out, I can go right now and get rid of it. I haven't done it yet. I haven't had time to do it. That basically was the statement that the government used throughout the trial and in closing to try to emphasize his knowledge. He's asking for permission to go get it and move it. Yeah. I think because he, he didn't, I mean, our brief goes into whether or not that meant the whole box. That was what he was indicted on or it was just those loose shells. But the, um, that, that, that statement was what they used to basically convict him of another offense immediately after being released. Um, so the, basically the statement by the PO, we're not arguing, falls under questioning, but it's the functional equivalent because he did accuse him of a crime that a reasonably, objectively reasonable suspect that had just been released from the same crime would have believed that they were being investigated for, again, another crime. So that's the position we are asking the court to take on this issue. And we have any further questions on that? I kind of wanted to go in, if it's okay, a couple of the cases the government cited, Bennett and Webb. Um, those are both Fifth Circuit cases, um, but they really look more to the nature of the situation rather than just a, you know, we're sitting in an interrogation room or it had to do with the safety of the officer. So like the weapon that they're mentioning that they then confiscated and charged the person with in Bennett, um, they, the police, the words they use were for the purpose of safety of the others and the threat that the potential suspect had. So the court found in that case that could not function as, uh, questioning under Innis. And then in Webb, um, that case, the suspect was suicidal and was, you know, fleed, climbed a tower and they were trying to prevent him from, from jumping. So they brought in a psychiatrist and the statement was actually made by the psychiatrist and that's when he elicited the information that incriminated him. But in that case, the similar where it's the situation that they're in and they also found in, in Webb that the psychiatrist was not acting as an agent of the, of the government and they were just trying to save him from suicide. Um, and so that's, those, those are distinguishable and we just, I just, I mean, there's really nothing exactly on point, um, but the cases out of the second and the third, you know, do suggest that we look more to whether or not it was communicated to a reasonable person in that situation, whether or not they were a suspect in a crime. Um, and I just asked the court to make a similar finding on that and, um, I can move on to the obstruction of justice. I wanted to make, mention a couple of things about that. Um, you know, the Supreme Court, this is the sentence enhancement, correct? The three, three, 1.1. Um, so the, we're, we're arguing procedural error here, um, that, you know, the Supreme Court requires that at minimum the district court makes finding that the obstruction of justice complies and encompasses all the fractional predicates of a finding of perjury, which would be in truthfulness at trial with respect to material matters that were designed to substantially affect the outcome of the case, and they did not make those findings. They only really met the first element, which the court said it was not telling the truth and it was trying to mislead the jury and mislead the court, and that was the extent of the finding for obstruction of justice, um, and where the courts, what courts have said in the, in the past were, were they failed to make the procedural correct, uh, findings on the record if the PSR makes a finding of an obstruction of justice and the court adopts the PSR orally on the record that that's sufficient, and they did not do so here. Um, the PSR actually made, um, said that he testified he was unaware that the box contained ammunition, so, um, and then they did have some discussion about the PSR, but it was not explicitly adopted in the, in the way that the course of the case was. But he testified, right, and he said it was in the closet, I didn't really know, it just sort of, so, so you're arguing is, is when that testimony denying the knowledge was, wasn't that material, and therefore shouldn't be the predicate for an enhancement? Well, that would be a substantive challenge, I believe, and this would be, we're saying procedurally that the court did not make the, the requisite findings on the record that they would be required to make under Dunnigan, um, and, you know, and it, it's pretty clear in this court's precedent under Ricardo, which was cited in the brief, that a conviction alone can't be the basis of a test, testifying defendant committing perjury, because, you know, they didn't want to silence the defendant from being able to testify in their own defense. So just because the jury made a finding that they believe the credibility of the, the United States evidence over the defendant's evidence does not give the, does not, that doesn't rise to perjury for purposes of an enhancement under the guidelines. Um, so we're, we have to look to, here we're just arguing in the procedural sense, not substantively whether or not he did or did not commit perjury, we're saying the trial court did not procedurally, um, do the correct findings, and that was, that was objected to. So, um, running out of time, I wanted to mention one thing just on the legal sufficiency challenge, because, um, it was, I don't know that it was as abundantly clear in the brief as it needed to be. So, you know, there, there's plenty of case law that talks about, you know, even five rounds is enough to be conviction under 922G1, so, um, but the, this case, they specifically indicted him under the very specific, um, rounds and, and ammunition that was found in the box. So that's what the government had to prove, not just that he had those three rounds or those ten rounds that they found loose, um, when they came and did the inspection earlier. So I just wanted to mention that, um, under, under the Chamber's opinion. And that's it. I, I really don't have any, I think. You've saved time for rebuttal. Thank you. Yes, thank you. Mr. Durbin? Good morning, may it please the Court. Richard Durbin for the United States. The, uh, I guess the principal question that's raised, uh, is a question of was there a functional equivalent of interrogation here when Brad Richardson, the probation officer, told Mr. McMarion, uh, you were going to, uh, under the provision that allows us to search your house, probation officer Vargas saw two bullets there and we're going to check and make sure that you clean them up. Um, that occurred at the probation office, apparently it was in a, a restroom or where they take your analysis. The district court did not make a specific finding, whether or not that was custody at the time. There was considerable testimony about when handcuffs were placed on Mr. McMarion. Um, the court, uh, did not resolve that, but Mr., uh, the probation officer Richards couldn't remember exactly, um, logically it makes sense that he probably put them on after Mr. McMarion said, can I go clean up now? Because part of the concern was safety for the officers and it's not in the record, but I assume they're also concerned that he would abscond or he might not show up because he was arrested later that day, as I understand it, after they actually conducted the search. Um, so that's the question. The, uh, the cases that if we, obviously the district court did seem to jump to interrogation, fair inference, it found three officers around the guy with uncertainty about cuffing. Okay, that's custody. I'm not going to argue. You're not going to argue. So we're, we're really in the world of when a probation officer says we're going there, there's going to be contraband, right? And then the, and the, and there's really no case law on that. You know, I, I, I don't, I looked, I went back to Bennett and I think Bennett is the, is probably the best fifth circuit case. Well, am I right that there's a difference between a police officer saying, Hey, your wife consented, we'll go in. I think that would sound like a functional equivalent to a question where it's reasonably likely to elicit something if the guy knows there's contraband or the police are asking. Yeah, the police say we've got a warrant. They don't. They say the wife consented. They don't. And the man knows, Oh, there's contraband. So he then admits, confesses, you're going to find something that would probably be an NS question. Disagree if I'm wrong. So the, I mean, depending on the circumstance, yeah, I think that's much more so than the circumstances here. Because why? Because, well, as you have pointed out, the probation office has a different function. They're not law enforcement officers. They're not investigating crime. They're trying to determine whether or not on behalf of the court, whether the defendant is complying with the conditions of release. And they had clear reason to believe that he wasn't. And I mean, I, I look at it as in, in Bennett, the police found a rifle as they were arresting the defendant. I think it was a rifle and said, ah, here's, there's a rifle here. And the claim was, Oh, that was interrogation because the defendant said, yeah, I use it for beer hunting and be careful. It's got a hair trigger, I think was Bennett. And that was not functional. But those are spontaneous. So was this, I think. Well, didn't, I mean, but they'd already knew, they knew what was there. Well they knew what was there. And then they get him in a room and then they say, we're going there. And they bring a guy in who's on supervision and they say, okay, here's the reason we brought you in. And this is what we're going to do. I mean, I think that that would be sort of what you would naturally expect a probation officer to do. Tell them why you're here. They're trying to work with this guy. They have a relationship with him saying we asked you in because there were bullets found there and we're going to go see if you clean them up. I don't think that would reasonably foreseeably think somebody then is going to jump out and say, Oh yeah, they're all there. Let me go clean them up. I don't think that it was, I don't think there was any design to the extent. The testimony is there were, there were three officers. There was Richards. I believe there was Vargas and I can't remember who the third one was. Three officers there just to bring him in, check on him. Well, I think that because they are preparing to go do the search and they're going to take him to the location of the search, they took him along and they had him in the car where he waited during the course of the search. And I think there were at least four officers who were engaged in the search. And so, I mean, this, it wasn't, it wasn't, they were trying to get a statement from him concerning what was in the house. They were going to go look in the house. There was no question of that. They didn't need warrant. They didn't need paper. And they were going to go look. And I mean, I read the record and I go, why on earth would he say that? I would not personally have expected him to say, let me go clean it now. But that's, that's what the circumstance was. And I think that there's sort of two lines of cases. I can't find one that, I haven't found one that has basically an officer saying, this is what you're arrested for and this is where we're going to take you next. And then the defendant somehow spontaneously responds to it. The cases cited by the appellant in the 28-J, those were circumstances primarily where there was an accomplice who had been interviewed and, and confessed and implicated the defendant. And then the, the action of the officers thereafter was to either confront the defendant with the statement and the, the, uh, incrimination by the accomplice or actually have him meet with him. Um, I, I don't think there's any trouble with those. That's not what this case is about. There was no, there was no confrontation of him. Then the other cases that I find are Bennett and there's, there's a couple others. There's a case called Nelson from this circuit. I don't think we cited it, um, but, but they, they're basically the same circumstance where during the course of an arrest, the police identify evid, incriminating evidence, which prompts the defendant to make some sort of a response. And the court has, this court has said that those are not the functional equivalent. And I think it's the spontaneity of a blurt out as distinct from as distinct. Well, I mean, interrogation to me implies at the very least that the interrogator is trying, is doing something to get information, incriminating information from the suspect under circumstances where they're either in custody or as in the cases, uh, cited by appellant where they've invoked their rights, they're in custody and they've invoked their rights to silence or the right to counsel. And that was not the circumstance here. Is this a case where we would give deference to the district courts for our dear of Richards? Was that exactly what the district court was probing? What was, what were, you know, what would a reasonable officer in your position have expected? No, they didn't really talk about that. What the question was before the district court, because there was no written motion to suppress. In fact, the district court spent some time saying, I don't know why you didn't file a motion to suppress. We've talked about this. And then it comes up in the middle of trial, in the middle of Richards testimony, the court lets the jury out and then takes Richards testimony to determine specifically what happened. And Richards under questioning by Mr. McMarion's lawyer, um, I can't remember if I actually cuffed him first. This is at pages 579 and 80 of the record. Um, I can't remember what order it was. Um, I would have gone over the condition first and I know it was right after I went over the conditions. I told him that she had seen ammo and that we're, you know, we're just going to go, we're going to use this search condition because she had seen ammo at your house. We're going to make sure you clean it up. And then he said, can I go now? I can go clean it up now. I'm busy. I've been busy. And Richards said, and I said, it's too late now. And I think I'm pretty sure I cuffed him after that. And so the court was, the district court was looking at and it's finding as I understand it was, was focused on whether his statements were in response to any questioning and there were no questions. And Richard's testimony is fairly clear. He testified several times. He testified. The whole premise of innocence. There isn't a question. There was no question. But is there a functional equivalent, but there was no, there was no discussion of functional equipment. Are we really flaced with, I mean, it is startling to me that because probation notify people they're going to go do a home tour all the time. Absolutely. And neither of you have found a case that says they either do or don't have to Miranda somebody. And I'm thinking it was maybe because this isn't so remarkable, you know, because it goes on all the time and it, it hadn't previously occurred. Are you asking, do you think we've got to write this as a bright line rule? Anytime probation calls in someone on conditions and then says, we're going to your house because we think we might find something and then they say, yes, you will. We would be announcing that that's not an in a situation that's that notification to is never the functional equivalent of an interrogation. Well, I don't, I don't know if there might not be circumstance where it is, where circumstances where it is, I guess. But, but if you admit there were circumstances, number one, they call them in number two, they know there are, were guns at some point open. And number three, it's pretty custodial, the cuffing in the room, all that sort of bleeds into if there are going to be circumstances, this might be the one where they would have expected. He'd say, yep, you got me. Well, I would think that that would be a record that somebody would have had to have made. And they didn't ask those questions. And Mr. Sykes, Mr. McMarion's lawyer, didn't go into that. That's not what the questions were about. And I just clarify and I appreciate, I mean, with your experience, you're not really pressing this was harmless in, in terms of, but correct me if I'm wrong, in closing the government, the whole defense is Sienter and the government says you heard him say he knew. We know we argue that. You argue, but it's not, I don't know that this made or broke the case, but, but I, I don't, I mean, you're not, I can't say, well, we didn't really care about it. It didn't make any difference to us. And but correct me if I'm wrong, then also procedurally, the argument is, oh, they've waived this by not filing the motion to dismiss. I mean, most of us, it is irregular, but it does look like the government preterminated that by saying, don't worry, we won't use it. Then the government says, now we want to use it. Looks to me like that's the equivalent of a fifth amendment determination. I think it was a, I mean, we say in the brief that the district court made the determination on the merits. Now, what, whether or not the arguments were fully developed, they were not, and the district court expressed frustration. Candidly, judge, I don't understand the stuff about the motion in limine. I don't understand what the theory was. Why would you do this as a motion in limine? Rule 12 says if you want to suppress evidence, you file a motion before trial. And the district- But you didn't. The government didn't, when they said, hey, we've got a fifth amendment argument, the government didn't say, hey, no good cause for doing it late, right? There is no, that isn't your argument to us. No, no, that was not. I mean, and the district court heard it. Well, let's hear what Mr. Richards has to say, and he went through and he heard it. And so that's where, that's where it ended up. Yeah. But I don't think that you're writing for, for a general rule to probation officers, but, but I don't know by the same token that you want to create this rule that every time a probation officer is going to deal with somebody about a condition that they have to Mirandize them. That just seems like a not very practical rule. And it puts the probation officers in sort of, in the position of law enforcement officer, which they are not. It's wrong to pick an interrogator out for criminal purposes. If you, if you do that, it's going to change the relationship between the two. If you have the general rule that they have to- I agree. Mirandize everybody else. I think that's exactly right. And that's why I think the distinction between a police officer and a probation officer is     Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah.         Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. I agree. I agree. On the obstruction of justice finding, the district court specifically found, at pages 172, 177, 179, he heard the trial testimony. He heard the evidence. This is on the perjury enhancement. This is on the perjury enhancement. He believed McMarion tried to mislead the jury and the court, which I think encompasses willfulness. And he obstructed justice under oath before the jury because he was trying to mislead the jury, and the only reasonable deduction is he was lying to the jury. I would also note that in support of the court's finding, although the court didn't mention it, when Richards was testifying, not before the jury, but during the hearing, he said that apparently there was questioning while they were in the car together. And that was not offered, and there was no ruling on it. But he did say that he—Richards said that McMarion told him the ammunition was old and had been there for years. And the significance of that is Mr. McMarion knew. He had told Richards. He knew it was there. He knew what it was. It was the ammunition that was left over. There was also testimony, interestingly, by McMarion's mother, who made several references to, yeah, they left the ammunition. They left—it's been there since 2017. They had left the ammunition before. And so there was ample basis for the district court to find, not that the jury disbelieved him, but the district court made its own determination that he had lied and that the materiality of it was fairly obvious, because it indicated he—his lie implied that he had knowledge that the ammunition was there. And in fact, he testified that he knew about some of it. And he had been finding ammunition, and he claimed he threw it away, although there was no evidence of that. And so that under the circumstances, if you look at Perez Solis, which applies Dunnegan, the district court is supposed to find that it's false, material, and willful. Well, the court found it was false. The materiality is pretty obvious from the circumstances, and he found it was willful by finding that he was trying to mislead the jury. And so from a standpoint of procedural error, I think the record supports the district court's finding in the application of the obstruction adjustment. I think, finally, the point on sufficiency, I think that, Judge Hickinson, you often ask, what is your best case? I think the best case is a case called Hunsberry, which we cite, which is in some ways remarkably similar. It was a circumstance where the defendant was residing in a house, and unlike Mr. McMarion, who was the sole resident in this place and had been the resident years before, before he served his prison term, in Hunsberry, the defendant lived there with somebody else. There was a fire. There were firearms found. And there was evidence that the firearms, that he had taken the firearms to the location some years before, sort of strikingly similar to Mr. McMarion knew those firearms were there. He is, or the ammunition was there, and there he is four years later, and it really is kind of like all over the place. I know that the photographs depict some of the ammunition after it's been taken out of there's gunstocks, and then there's this sort of loose, scattered ammunition all over the place. And I think that the jury could reasonably infer that he knew the ammunition was still there. If there are no questions, I will give you back my four minutes. Thank you, Mr. Durbin. Thank you very much. Other? For Ravone? Thank you, Your Honor. Going back to the exclusion and whether it's a functional equivalent of questioning, I wanted to just kind of answer Judge Higginson, your question about should we make the rule that any time they're at the probation office, that that's not a Mirandi situation. And I think that would be extremely dangerous precedent to set because, like for instance, if you're supervised by the probation officer and they bring you in, they cuff you, there's three people standing there, and they say, we have a video of you robbing a bank. And they blurt out, oh, yeah, I did it. That would be the kind of situation that we want to protect because the parole officers, while they're not operating as law enforcement officers, they're essentially kind of stepping into the role of an officer because they're enforcing the probation conditions, one of which is don't commit another crime. So if they are, if there's this distinction, and this specifically is one of those maybe unusual situations where the parole officer brings in a suspect that they suspect committed another crime. They don't bring in law enforcement. Maybe that doesn't happen very often because normally the parole officers or the probation officers kind of role is more about keeping them straight. He's been out three weeks, so let's make sure that you don't violate. Here it's like that particular parole officer, I keep saying parole, probation officer had actually kind of investigated this. He heard the other, the female officer who found the three bullets, and he said, whoa, I'm going to figure out what's going on here, and almost kind of acted as an actual law enforcement officer. He didn't say, let's go get that cleaned up so you don't get violated. You just committed another crime. So the actual statement where he informs Mr. McMarion that they know that they found bullets, they saw bullets, they know they're there. That's basically like telling him you've committed a crime, you're a violation. And so when he blurted out whether it's the timing of that or exactly how that happened, it does fall under the situations where we're in. But in those cases, are sort of cops find something really incriminating right in front of the arrestee, and then they blurt out, okay, that's mine, that's not mine, that's mine. And those aren't generally seen as consequences of interrogation. That is correct. But in those cases, the nature of the situation, they look at the totality of the circumstances. In those, there was a second situation that was going on that took precedent over Miranda, which is the safety of the officers. And of course, Bennett, you know, they wanted to make sure that they secured the weapon so that it was not going to harm anyone. So that was more, like the government had the interest of protecting themselves and the others around them, which was a higher interest than the Miranda. So here we don't have that scenario. The only time, they did testify that they put him in cuffs to protect them. We don't know when that happened, and I don't know that that matters. But that there was no situation where they tried to elicit a confession based on anything that really had any other reason other than just to, hey, by the way, you've committed another crime, and then blurts out the response. Maybe that this fact pattern may never come up again. I'm not sure. I think that another thing I did want to mention, though, is that it's not the reasonable officer. That can be a consideration, but the test is a reasonable suspect. So instead of looking at an objectively reasonable officer and whether they were trying to elicit a confession, it's whether an objectively reasonable suspect would perceive the situation as such that they were being accused of a crime. So looking at it from a slightly different perspective, I think in this case, the specific facts where this particular individual had literally been out on supervisor at least three weeks, and he was being accused of the exact same crime he'd already been locked up for. So that's kind of a unique situation, that that objectively reasonable person would absolutely be concerned that I'm being accused of a crime and I'm going to go back to prison. So that's kind of an unusual situation. I would want to say one thing about the ... Sorry, I lost my ... Basically, I'm just going to stop there. Unless you have any questions. I don't have anything else. Okay. Thank you.